672 So.2d 844 (1996)
HALLIBURTON COMPANY, Appellant,
v.
EASTERN CEMENT CORPORATION, Appellee.
Nos. 94-0072, 94-0591.
District Court of Appeal of Florida, Fourth District.
March 6, 1996.
As Modified on Grant of Clarification May 13, 1996.
*845 Peter A. Sachs and Stephen J. Aucamp of Jones, Foster, Johnston & Stubbs, P.A., West Palm Beach, for appellant.
Gregory Barnhart and Jack Scarola of Searcy Denney Scarola Barnhart & Shipley, P.A., and Russell S. Bohn of Caruso, Burlington, Bohn & Compiani, P.A., West Palm Beach, for appellee.
FARMER, Judge.
This is the second appearance of this case before us. In its previous manifestation, we reversed a directed verdict which had ruled as a matter of law that the "no warranty disclaimer" in seller's offer trumped the express warranty provision in buyer's acceptance. Eastern Cement Corp. v. Halliburton Co., 600 So.2d 469 (Fla. 4th DCA), rev. denied, 613 So.2d 4 (Fla.1992). We determined that the two varying provisions canceled each other, and that the remaining contract implied statutory warranties of fitness for a particular purpose and merchantability. Having so decided, we added: "under section 672.715, Florida Statutes (1989), the buyer can recover both incidental and consequential damages when these implied warranties are read into the contract." 600 So.2d at 472.
On this second appeal, seller argues that its disclaimer survived our first opinion and that, as a matter of law, its disclaimer of warranties effectively bars buyer's cause of action for breach of warranty damages. We again disagree with seller's argument for the reasons expressed by Judge Downey in the first appeal.
Turning to the subject of remedies for breach of contract, we reject buyer's "for-want-of-a-nail" argument under which the trial court allowed the jury to award damages in this action involving the sale of goods. Essentially the buyer argued that if the goods sold, a single pneumatic cement pumping system, had been as warranted, it would then have purchased four additional systems and, thence, after chartering a vessel for a long term would have exploited the systems by entering the containerized cargo business. The jury accepted this evidence because it awarded damages representing the profits lost from the proposed containerized cargo business with the four additional systems operating as planned. Seller argues that buyer's damages were too remote and speculative to go to the jury.
Ordinarily, where the buyer has accepted non-conforming goods and sued for breach, as in this case, the buyer is entitled to general, incidental and consequential damages, which in a proper case may be an amalgam of some or all three. §§ 672.714 and 672.715, Fla.Stat. (1995); see also Hadley v. Baxendale, 9 Exch. 341, 156 Eng.Rep. 145 (1854). Section 672.714(2) states that the measure of general damages is the difference between the value of the goods accepted and their value as warranted. Section 672.714(3) provides that incidental and consequential damages may be recovered "in a proper case."
Consequential damages are defined in the Code to be:
"[a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
(b) injury to person or property proximately resulting from any breach of warranty."
§ 672.715(2), Fla.Stat. (1995). As the leading text on the UCC points out, "[t]he most commonly litigated and thus the most often sought after item of consequential damages is lost profits." White & Summers, 1 UNIFORM COMMERCIAL CODE 3rd, § 10-4, at 518. As this text also points out, to recover lost profits the buyer must generally satisfy the judicial requirements of foreseeability and certainty. Id.
The courts previously drew a distinction about lost profits between established businesses and those not yet begun. See, e.g., New Amsterdam Cas. Co. v. Utility Battery Mfg. Co., 122 Fla. 718, 166 So. 856 (1935) (claimant allowed to show lost profits as to established business by competent proof); *846 Innkeepers Int'l, Inc. v. McCoy Motels Ltd., 324 So.2d 676 (Fla. 4th DCA 1975), cert. denied, 336 So.2d 106 (Fla.1976) (recovery for lost profits not generally allowed for new business with no history); A & P Bakery Supply & Equip. Co. v. Hawatmeh, 388 So.2d 1071 (Fla. 3d DCA 1980) (same); but see Twyman v. Roell, 123 Fla. 2, 166 So. 215 (1936) (proof of lost profits for unestablished business allowable provided there is "yardstick" by which such profits may be measured). More recently, however, in W.W. Gay Mech. Contractor, Inc. v. Wharfside Two Ltd., 545 So.2d 1348 (Fla.1989), the court explained and modified its previous holdings:
"In New Amsterdam this Court held that prospective business profits are generally too speculative and dependent on changing circumstances to be recovered. New Amsterdam provided an exception allowing the plaintiff to show the amount of his loss by competent proof. However, this exception only applied to the interruption of an established business. Twyman, on the other hand, did not limit recovery to established businesses. There, the Court stated that, if there is a `yardstick' by which prospective profits can be measured, they will be allowed if proven. 123 Fla. at 6, 166 So. at 217. The Court provided further that the `uncertainty which defeats recovery in such cases' is the cause of the damage rather than the amount. `If from proximate estimates of witnesses a satisfactory conclusion can be reached, it is sufficient if there is such certainty as satisfies the mind of a prudent and impartial person.' Id. at 7-8, 166 So. at 218. See also Conner v. Atlas Aircraft Corp., 310 So.2d 352 (Fla. 3d DCA), cert. denied, 322 So.2d 913 (Fla.1975).
"We follow the holding in Twyman. A business can recover lost prospective profits regardless of whether it is established or has any `track record.' The party must prove that 1) the defendant's action caused the damage and 2) there is some standard by which the amount of damages may be adequately determined."
545 So.2d at 1350-51. Hence, although we regard buyer's evidence as to the indispensable yardstick in this case to be unusually weak, we find it necessary to concentrate our attention on the evidence relating to the cause of the damage rather than the amount.
The issue of causation begins with a legal inquiry that, if satisfied, ends with a factual inquiry. This is so because the cause for any contemporary event can, if one is inclined to do so, be connected in a seemingly logical chain of circumstances and occurrences all the way back to creation. But the law imposes boundaries on the inquiry. Justice Cardozo once spoke of:
"that common-sense accommodation of judgment to kaleidoscopic situations which characterizes the law in its treatment of problems of causation. One could carry the search for causes backward, almost without end. [c.o.] Instead, there has been a selective process which picks the substantial causes out of the web and lays the other ones aside. * * * To set bounds to the pursuit, the courts have formulated the distinction between controversies that are basic and those that are collateral, between disputes that are necessary and those that are merely possible. We shall be lost in a maze if we put that compass by."
Gully v. First National Bank in Meridian, 299 U.S. 109, 117-118, 57 S.Ct. 96, 100, 81 L.Ed. 70 (1936). In short, the facts relating to causation must first satisfy legal restraints, i.e. the legal limits to how deeply into history the law will allow the cause for an event to be traced.
Here, the link of unrealized future events necessary to establish the loss is founded on the buyer's testimony that it lost $24+ million because the defect in the one system actually sold prevented the buyer from going into a new business in which 4 other systems would have been necessarily purchased and, with them, the profits would surely have flowed.[1] An expert opinion from an outside economist with a Ph.D. projecting future revenues, profits and economic probabilities for the anticipated success of a prospective new business venture may provide a reasonable *847 measure in a proper case for the loss of prospective profits in a business not yet begun, but it hardly addresses the causal relationship inquiry as to the proximate results of the breach itself.
Buyer's own evidence shows that the connection between the one system and the future business is, as a matter of law, too remote, too speculative, and too theoretical. The lost profits would purportedly have resulted from the operation of 4 additional systems, which the buyer says it would have purchased sometime in the future if the one system sold under the contract in suit had performed as warranted. There was not even a proposed contract for the future purchase of these 4 additional systems, and no discussion between buyer and seller as to possible terms. This future business would have been collateral and secondary to the business for which the single contractual system was purchased. Buyer had no personnel with experience in shipping containerized cargo. No express type of cargo was specified. The suggested scheme was not evidenced by formal plans, by proposed budgets, by specific site plans, by the formation of a new legal entity, or by anything that would have moved from an aspiration to a concrete (pun intended) plan.
All that was offered was a hope of commercial fortune hanging from a thin thread of "what-ifs"buoyed by the buyer's after-the-fact testimonial conviction that success and profits would surely have been there for the taking. The evidence forming the necessary chain of causation between the defects in the single system sold under the contract in suit and any possible future profits lost in the containerized cargo business comes down to little more than pure speculation. Buyer's evidence as to causation is as reliable as the "investment" at the $2 window.
It is in short, as seller argues, the nail that lost the kingdom. To borrow from Ohoud Establishment for Trade & Contracts v. Tri-State Contracting & Trading Corporation, 523 F.Supp. 249 (D.N.J.1981), cited by seller:
"The court would have little difficulty in submitting the loss of the shoe, the horse, and probably the rider to a jury if caused by the sale of a defective nail or the failure to deliver the nail as agreed. The loss of the battle creates a doubtful question, but the loss of the kingdom is so remote as to bar its submission to a jury."
523 F.Supp. at 255. The court added: "[i]f the manufacturer of the nail becomes responsible for the loss of the kingdom, then we may not have any more nails." 523 F.Supp. at 257.
We also agree as a matter of law that the dreamed-of system does not properly fit into the UCC's provision regarding "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know." The claimed loss clearly would not constitute "incidental" damages under section 672.715(1). Equally, it is not "injury to person or property proximately resulting from [the] breach of warranty" permitted by section 672.715(2)(b), for there is no possible claim here for injury to person or property.
Therefore, we affirm the jury verdict on liability but reverse the damages and remand to the trial judge to strike any award for lost profits for the future containerized cargo business.[2]
GUNTHER, C.J., and POLEN, J., concur.
NOTES
[1] We recognize that the actual testimony as to the lost profits came from an expert witness, and not the buyer directly, but that is a meaningless distinction under the facts of this case.
[2] As seller has conceded that there is evidence to support the award of $928,000 in direct consequential damages in the operation of the single system purchased, we remand for the entry of judgment in that amount only.