Laurel GONSALVES, Petitioner Below, Appellant, Cross Appellee,

v.

STRAIGHT ARROW PUBLISHERS, INC., a Delaware corporation, Respondent Below, Appellee, Cross Appellant.

No. 17, 1997.

Supreme Court of Delaware.

Submitted: Sept. 9, 1997.

Decided: Oct. 21, 1997.

Kevin G. Abrams (argued), Thomas A. Beck, and Russell C. Silberglied, Richards, Layton & Finger, Wilmington, for Appellant.

Steven J. Rothschild (argued), R. Michael Lindsey, Joseph M. Asher, and George F. Fraley, III, Skadden, Arps, Slate, Meagher & Flom, Wilmington, for Appellee.

Before WALSH, HARTNETT and BERGER, JJ.

WALSH, Justice:

This is an appeal from a decision of the Court of Chancery after trial of an appraisal action brought pursuant to 8 *Del.C.* § 262 following a short-form merger. The appellant-petitioner below contends that the Court of Chancery erred in its valuation findings in several respects, but, most importantly, in its uncritical acceptance of the appellee-respondent below's valuation evidence to the total exclusion of evidence to the contrary. The respondent has cross-appealed from the trial court's post-trial award of interest on the determined value of petitioner's share.

Upon review of the record, we conclude that the Court of Chancery's pretrial decision to adhere to, and rely upon, the methodology and valuation factors of one expert to the exclusion of other relevant evidence and the implementation of that mind-set in the appraisal process was error as a matter of law. Accordingly, we reverse and remand for a new valuation hearing.

## I

The underlying appraisal dispute involves the value of 2,000 shares of the common stock of the respondent Straight Arrow Publishers, Inc. ("SAP") owned by the petitioner, Laurel Gonsalves ("Petitioner"). SAP was founded in 1967 to publish *Rolling Stone*, a magazine focused on pop culture and rock and roll music. Petitioner acquired her shares, 2.3% of SAP's total outstanding, in 1971, while she was employed by SAP. In the late 1970s, a decline in advertising revenue generated by *Rolling Stone* prompted SAP, in 1981, to implement a repositioning plan. This plan was designed to increase the revenue and earnings of *Rolling Stone*, SAP's primary source of earnings at that time and through the time of the merger. In the early 1980s, SAP also became involved in other business ventures, most of which generated losses, and which were discontinued prior to the merger.

In the fall of 1985, Straight Arrow Publishers Holding Company, Inc., a company wholly owned by SAP's founder and majority stockholder, Jann Wenner, made a first step

$100 cash tender offer that closed on November 11, 1985. Contemporaneous with the tender offer, Martin Whitman, SAP's expert witness in this action, issued a fairness opinion, concluding that $100 was a fair price. Whitman's opinion was not based on SAP's earnings for the second half of 1985, which were not known at the time.[1] On January 8, 1986, Straight Arrow Publishers Holding Company, Inc. was merged with and into SAP. In the merger, all of SAP's shares were converted into the right to receive $100 per share or were canceled. The merger did not result in a change in corporate control.

Petitioner filed her complaint for appraisal in the Court of Chancery on May 5, 1986. The parties engaged in intermittent, but desultory, discovery over the next ten years, including the exchange of expert witness reports on valuation. The matter was eventually set for trial to begin on August 27, 1996. At a brief trial conference held on August 21, 1996, the Chancellor advised counsel that it was "[his] inclination and [his] temperamental approach ... to want to accept one expert or the other hook, line and sinker." The court also commented that, if the court engages in "detailed financial analysis," it creates incentives for the parties' experts to "create plausible bargaining ranges" and "drive litigants to the most extreme positions." The Chancellor indicated that in past cases he had made "a few adjustments to the one who I accepted, but I don't want to."

When the matter proceeded to trial it became obvious that the range of difference in the valuation views of the respective experts was quite large. James Kobak, petitioner's expert, valued SAP at the time of the merger at $1,059.37 per share, a figure over ten times the merger price. This calculation was based solely on the value of *Rolling Stone*, which, he concluded, was SAP's sole operating asset, accounting for substantially all of its revenue and earnings. In Kobak's opinion, a magazine is best characterized as an intangible business with relatively few fixed assets and, therefore, should be valued using an earnings capitalization valuation method. Kobak made several adjustments to *Rolling Stone's* reported pre-tax earnings to account

1. The tender offer materials, however, disclosed that a significant increase was expected.

for one time expenditures and deferred subscription income. Relying on *Rolling Stone's* adjusted earnings before taxes, Kobak arrived at an earnings base for SAP of $6,002,-000. In capitalizing SAP's earnings base, Kobak chose a price/earnings multiple of 14, derived from comparisons of sales of similar magazines and companies. Kobak selected a multiple of 14, which was the highest in the range for the middle 50% for such sales, because, in his view, *Rolling Stone* was well positioned to enjoy increasing profitability as of the merger.

Martin Whitman, respondent's expert, in calculating SAP's earnings base, used a method similar to the Delaware Block Method, analyzing SAP's yearly earnings value, asset value, and market or trading value. The latter two "blocks" were given a weight of 10% each because there was no active market for SAP stock and because, like Kobak, Whitman believes that magazines are essentially intangible businesses whose tangible assets do not reflect the essential value of the company.

Rather than rely solely on the 1985 earnings of *Rolling Stone* to arrive at the value of the "earnings block," Whitman used SAP's five year earnings, ending December 31, 1985.[2] Accordingly, Whitman arrived at an earnings bases of $1,372,755, reflecting earnings before interest and taxes ("EBIT"), and $1,523,846, reflecting earnings before interest, taxes, depreciation and amortization ("EBITDA"). In selecting multiples of 9.5, based on EBIT, and 8.5 based on EBITDA, Whitman analyzed implied capitalization rates of comparable companies with publicly traded stocks, instead of magazine purchases and sales as had Kobak. Whitman believes that these multiples, which are lower than the median multiples for the selected comparable companies, are appropriate due to SAP's relatively small size, dependence on a single print publication, low EBIT and EBITDA margins, volatile operating profits, low level of capital reinvestment, speculative use of its excess cash, non-dividend paying policy, and contingent liabilities, as well as

*Rolling Stone's* lower-than-median readership demographics.

Turning to the less weighted components of the analysis, Whitman estimated SAP's trading value by examining the purchases of SAP stock from 1981 to June 1984, which totaled only six. All of these purchases were corporate repurchases at prices ranging between $15 to $20, and none occurred during the 20 months directly preceding the merger. In April 1984, however, 1,000 shares of SAP were sold to the company at a price of $20 per share. With respect to the asset value of SAP, Whitman averaged the value produced by two different methods. First, using the book value method, he concluded that SAP had an asset value of $156.56 per share at the time of the merger. Using a theoretical takeover value method, Whitman concluded that SAP's asset value was $244.79 per share. Thus, he concluded that, on average, SAP had an asset value of $200 per share at the time of the merger. Accordingly, Whitman concluded that SAP's fair value as of the time of the merger was $131.60 per share.

SAP also presented, on rebuttal, the testimony of Daniel McNamee, III, an expert in the magazine publishing field. McNamee supported Whitman's opinion on several issues, specifically, the use of a five-year earnings base and multipliers, as calculated. McNamee criticized Kobak's opinion on his conclusion concerning *Rolling Stone's* market positioning at the time of the merger and for the use of: (i) a 1985 earnings base rather than a five-year earnings base; (ii) adjustments to earnings made for deferred subscription income; and (iii) selection of a high price/earnings multiple.

In his post-hearing opinion, the Chancellor prefaced his findings by noting that the case presented a typical appraisal trial in which the dynamics of the judicial process "tend to produce evidence of absurdly differing values." The court noted that, while there was a wide variation in the fair value estimate of the two experts, eighty percent of the difference resulted from the selection of the base used for earnings capitalization. In the Chancellor's view, because the earnings mul-

---

2. The five year pattern reflected significant fluctuation: 1981—$458,600; 1982—$698,000; 1983—$2,255,000; 1984—$804,000; 1985—$3,470,000.

tiple selected by Whitman (13) was "rather close to the 14 multiple employed by Mr. Kobak," the critical determination facing the court was whether to accept the five year base advanced by Whitman or the one year base selected by Kobak.

Petitioner argues that the Chancellor's adoption of a five year earnings base, compounded by the acceptance of every adjustment to earnings and assets made by Whitman, was inconsistent with the Court of Chancery's "affirmative duty to consider the nature of the enterprise as an element of its valuation" set forth in this Court's decision in *Rapid–American Corp. v. Harris,* Del.Supr., 603 A.2d 796, 799 (1992). SAP responds that, in discharging its appraisal function, the Court of Chancery is afforded wide discretion and, in view of SAP's "historic earnings validity and low profit margin," the selection of a five year base was within the Chancellor's discretion. Moreover, SAP argues the Chancellor's finding that Whitman's opinion was "accurate and reliable" is, in all respects, "the product of a logical and deductive process and is binding for purposes of appeal."

## II

■ We begin our analysis by addressing the standard of review. The Court of Chancery's determination under the appraisal statute, 8 *Del.C.* § 262(h), has traditionally been granted "a high level of deference" by this Court. *In re Appraisal of Shell Oil Co.,* Del.Supr., 607 A.2d 1213, 1219 (1992). This deference reflects a recognition that appraisal cases tend to be factually intensive and often involve competing valuation methodologies. The Court of Chancery's fact-finding role in appraisal cases often requires the court to cope with "widely divergent views reflecting partisan positions" in value-fixing tasks. *Id.* at 1222–23. But the deference standard also assumes that the court will employ its own acknowledged expertise, which is essential to the appraisal task.

The modern appraisal process presumes a sophisticated judge who exercises independence in determining the value of corporation in a contested proceeding. The role of the Court of Chancery has undergone significant change, however, since the appraisal remedy

was created in 1899. *See* Calio, Joseph Evan, *New Appraisals of Old Problems: Reflections on the Delaware Appraisal Proceeding,* 32 Am.Busn.L.J. 1, 12 n. 44 (1994). In the original 1899 appraisal proceeding, value was determined by three disinterested appraisers: one chosen by the directors, one chosen by the dissenting shareholder, and one chosen by those selected above. *Id.* (citing 21 *Del. Laws* 273, § 56 (1899)). The value determined by these appraisers was conclusive proof of the share's value. *Id.*

In 1943, the General Assembly reduced the number of appraisers to one. 44 *Del. Laws* 125, § 6 (1943). The 1943 DGCL provided:

> the Court shall determine the shareholders who have complied with the provisions of this section and become entitled to the valuation of and payment for their share, and *shall appoint an appraiser* to determine such value.

*Id.* (emphasis added). Under the 1943 version of § 262, the Appraiser had the same "powers and authority as may be conferred upon the Masters by the Rules of the Court of Chancery or by the order of his appointment." *Id.* The Court of Chancery was to determine its own value for the corporation's shares after hearing the exceptions based on law and fact to the Appraisers' report. *Id.* Thus, the Appraiser's value was no longer considered conclusive proof of the value, but was accorded "some weight." *In re General Realty & Utilities Corp.,* Del.Ch., 52 A.2d 6, 11 (1947). *See also Charlip v. Lear Siegler, Inc.,* Del.Ch., No. 5178, Brown, V.C., 1984 WL 8248 (Nov. 27, 1984), slip op. at 8 ("I do not deem it proper, in considering exceptions taken from the report of a master or an appraiser, to ignore his findings and review the entire evidentiary record anew."). If the Appraiser was known in the community, however, as "highly-reputable" and was a longstanding member of the Delaware Bar with considerable experience in corporate matters, the Court might accept the Appraiser's value uncritically and *in toto. Charlip,* slip op. at 9.

In 1976, the General Assembly eliminated the role of the Appraiser by enacting a new version of DGCL § 262, which provided "the

*court* shall appraise the shares...." 60 *Del. Laws* 371, § 7 (1976) (emphasis supplied). The legislative synopsis for the bill proposing this change recites that "[e]xperience has shown this two-step procedure to be wasteful of time and money." Comm. to H.R. 916, 128th G.A., 2d Sess. (1976) (enacted). Thus, the modification in the procedure was intended to "provide for the streamlining of the appraisal process by the elimination of the appraiser. The action will now be heard by the Court of Chancery in the first instance." *Id.*

The role of the Court of Chancery has evolved over time to the present requirement that the court independently determine the value of the shares that are the subject of the appraisal action. *See In re Shell Oil,* 607 A.2d at 1221; *Weinberger v. UOP, Inc.,* Del. Supr., 457 A.2d 701, 713–14 (1983). Even though today a Chancellor may be faced with widely divergent values presented by the parties' experts, the acceptance of one expert's value, *in toto,* creates the risk that the favored expert will be accorded a status greater than that of the now-eliminated master.

This is not to say that the selection of one expert to the total exclusion of another is, in itself, an arbitrary act. The testimony of a thoroughly discredited witness, expert or lay, is subject to rejection under the usual standards which govern receipt of such evidence. *See Security First Corp. v. U.S. Die Casting and Dev. Co.,* Del.Supr., 687 A.2d 563, 569 (1997).

The nub of the present appeal is not merely that the Chancellor made an uncritical acceptance of the evidence of SAP's appraiser but that he announced in advance that he intended to choose between absolutes. True, the Chancellor did not, nor could he, indicate which side he would favor, but the evidentiary construct he established for the subsequent trial created a standard for value determination which is at odds with Section

262's command that the Court "shall appraise" fair value.

Thus, while we recognize the deference due a judicial determination on the mixed fact/law question of fair value under Section 262, we believe the valuation approach of the Chancellor in this case presents a question of law. That question, as we pose it, is whether the Court of Chancery may adopt an expert's valuation views under a previously announced "hook, line and sinker" rationale in the face of significant arguable considerations advanced by both sides of the dispute.

## III

■ The Chancellor was confronted with divergent views by the two principal experts in several areas of valuation, but he focused upon the earnings base as an "either-or" determination, which, in large part, dictated the result. There is justification for the Chancellor's rejection of a one year earnings base despite Kobak's insistence that 1985 was the best indication of SAP's potential since SAP's Repositioning Plan was put into effect that year. As the Chancellor noted, under Delaware decisional law, a one year earnings base in appraisal cases has met sparing approval. But there is also support for Petitioner's argument that 1985 was a precursor year and indicative of post-merger growth.[3]

Rejection of a one year earnings base, however, does not, *ipso facto,* require acceptance of Whitman's alternative five year base. SAP experienced fluctuating earnings in each of the years from 1981 to 1985. If the 1985 earnings were deemed aberrational, it could be argued that they were much more reflective of current prospects than the 1981 earnings of $458,000. The inclusion of that figure, the lowest of any of the figures in the five year earnings base, could be said to equally distort the pattern of going concern value. Whether such a rejection is warranted is of course a matter for the Court of Chancery to determine in the first instance,

**3.** The Court of Chancery acknowledged, but declined to credit, SAP's June 1984 internal projections which indicated that the company expected significant increases in earnings, advertising revenues and subscription revenues over the next four years. This projection was apparently realized when industry analysts estimated, in August 1987, that *Rolling Stone* alone could be sold for $100 million.

but its selection or rejection should not spring from an "all or nothing" mind-set reached at the beginning of the analysis.

We do not suggest that the selection of an alternative earnings base, *e.g.*, a two year or three year period, was required in this case. But consideration of alternative earnings bases, other than the two choices advanced by the experts, was clearly within the court's discretion had the court not adopted a hook-line-and-sinker approach. Moreover, a determination of alternative earning bases is subject to easy calculation on the stipulated data. As this Court stated in *Cede & Co. v. Technicolor, Inc.*, the Court of Chancery may "select one of the parties' valuation modes as its general framework, *or fashion its own.*" Del.Supr., 684 A.2d 289, 299 (1996) (emphasis supplied).

We also question the Court of Chancery's offhand rejection of Kobak's use of 1985 earnings as not sustainable for future purposes "without the aid of hindsight." As the Chancellor noted earlier in his opinion, post-merger evidence is not necessarily inadmissible to show that plans in effect at the time of the merger have born fruition. In *Cede & Co. v. Technicolor, Inc.*, we noted that the failure to value the company as a going concern may result in an understatement of fair value. 684 A.2d at 299. While speculative elements of value should be excluded from the valuation calculus, the purpose of such restriction is to eliminate "*pro forma* data," not to bar expert evidence of value based on the nature of the enterprise. *Rapid–American v. Harris*, 603 A.2d at 805; *Weinberger*, 457 A.2d at 713.

Ironically, Whitman's opinion is based, in part, on an enterprise valuation that assumed that SAP would initiate diversification efforts after the merger and that the new businesses would result in losses and continued volatility in earnings. Indeed, Whitman's basic valuation methodology was to first determine "enterprise value" for SAP based on relevant factors and then to check the result by performing a price/earnings analysis. Implicit in that analysis is a recognition that the enterprise in place in 1985 must be valued with consideration of factors which will likely occur post-merger.

The difficulty confronting the Court of Chancery in this proceeding when faced with what the court characterized as "opinion evidence of absurdly differing values" is not without solution. As this Court suggested in *In re Shell Oil*, the Court of Chancery has the inherent authority to appoint neutral expert witnesses, "whenever it believes that a more objective presentation of evidence is required, particularly in valuation matters." 607 A.2d at 1223. We continue to commend that alternative in appraisal cases.

In sum, while we acknowledge the Chancellor's thorough effort to sift through a welter of complex and often contradictory evidence, his valuation determination reflected an either-or approach, which is at variance with the Court of Chancery's statutory obligation to engage in an independent valuation exercise. Accordingly, we conclude that the valuation process was fatally flawed and that the matter must be reversed and be remanded for further consideration.

## IV

■ Although we conclude that the valuation determination of the Court of Chancery must be reversed, to assist the court and the parties on remand, we take the occasion to rule upon a separate and significant claim of error asserted by Petitioner—the exclusion of evidence that SAP should be valued, on an ongoing basis, with an adjustment for alternative CEO compensation.

The Court of Chancery's ruling was in response to a pretrial motion *in limine* filed by SAP seeking to exclude as irrelevant certain testimony of Petitioner's expert, Kobak. Kobak was to testify that, in valuing SAP, the compensation paid to SAP's CEO, Jan Wenner, its founder and majority stockholder, was excessive and that Wenner's 1985 salary and benefits of approximately $1.5 million must be adjusted to reflect what a substitute executive would be paid under industry standards. Thus, SAP's adjusted earnings would better reflect the normalized expected performance of the company on a going forward basis.

In granting the motion *in limine*, the Chancellor noted that Petitioner did not seek

to prove that Wenner's compensation constituted a breach of fiduciary duty and that there was no separate derivative action to that effect. The court also acknowledged that, in theory at least, any sale of corporate control affords the buyer the opportunity to affect a variety of cost savings measures which may impact earnings. But, as the Chancellor correctly ruled, a petitioner in the appraisal process is entitled to "a *pro rata* proportion of going business value of the corporation at the moment before the merger." That value does not include the capitalized value of possible changes which may be made by new management.

■■■ We agree with the Court of Chancery that in the absence of a derivative claim attacking excessive compensation, the underlying issue of whether such costs may be adjusted may not be considered in an appraisal proceeding. *Cf. Cavalier Oil Corp. v. Harnett*, Del.Supr., 564 A.2d 1137, 1143 (1989). Moreover, where the corporation's going forward business plan is to retain the same management, a dissenting shareholder seeking appraisal may not seek to attribute value to an alternative cost pattern which may occur post-merger. *Cf. Cede & Co. v. Technicolor, Inc.*, 684 A.2d at 298–99.

## V

Finally, we note that SAP has cross-appealed from the Chancellor's award of the legal rate of interest (12.5%) over the 10 year period during which the appraisal action was pending. SAP's principal grievance is that the Chancellor did not explain the basis for his decision to award the legal rate of interest rather than a weighted rate recommended by its expert. SAP also contends that Petitioner should not be awarded interest for the time she delayed bringing the matter to trial.

■■■ The Court of Chancery has broad discretion in both the fixing of the rate of interest and the period of its application in an appraisal proceeding. Its determination will not be disturbed unless arbitrary or capricious. *Alabama By–Products Corp. v. Cede & Co.*, Del.Supr., 657 A.2d 254, 267 (1995). We agree with SAP that the Chancellor gave no reasons for his selection of the legal rate of interest to the exclusion of SAP's blended analysis. Nor did the court address SAP's contention that Petitioner should not be awarded interest for the time when the case languished in the Court of Chancery. Since we have concluded that the matter must be reconsidered, we assume that the Court of Chancery will supply reasons for any award of interest if that issue continues to be a matter of dispute.

The judgment of the Court of Chancery is REVERSED, in part, and the matter REMANDED for further proceedings consistent with this opinion.