**SUN INSURANCE MARKETING NETWORK, INC., Plaintiff,**

v.

**AIG LIFE INSURANCE COMPANY; American International Life Assurance Company of New York; and American General Corporation, Defendants.**

No. 8:01–CV–2302–T–30MSS.

United States District Court,
M.D. Florida,
Tampa Division.

March 27, 2003.

Alan Frederick Wagner, Wagner, Vaughan & McLaughlin, Tampa, Roberto A. Rivera–Soto, Daniel G. Lyons, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, for Sun Insurance Marketing Network, Inc., plaintiff.

Margaret Diane Mathews, Wesley D. Tibbals, Akerman, Senterfitt & Eidson, P.A., Tampa, Mark A. Aronchick, Daniel Segal, John S. Summers, Robert L. Ebby, Hangley Aronchick Segal & Pudlin, Philadelphia, PA, for AIG Life Insurance Company, American International Life Assurance Company of New York, American General Corporation, t/a American General Life Companies, a member of American General Financial Group, defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND STRIKING OPINION OF PLAINTIFF'S EXPERT

MOODY, District Judge.

THIS CAUSE came before the Court upon Defendants' Motion for Partial Summary Judgment (Dkt.# 58) and Plaintiff's response thereto (Dkt.# 60). The Court entered an Order denying the Motion on November 12, 2002, but subsequently granted a Motion for Reconsideration and, by Order dated January 28, 2003, requested additional briefing on the opinion of lost profits expressed by Plaintiff's expert. Subsequently, the Court received the Defendants' Supplemental Brief in Support of their Motion for Partial Summary Judgment (Dkt.# 71) and the Plaintiff's Supplemental Brief in Opposition (Dkt.# 72). Having reviewed the record and memoranda of the parties, the Court determines that the opinion of Plaintiff's expert should be stricken because he is not qualified to give an opinion on the valuation of a business and his opinion of lost profits is too speculative.

### FACTUAL BACKGROUND

Sun Insurance Marketing Network, Inc. ("Sun") is an insurance agency which sells only long term care insurance. It has a non-exclusive relationship with approximately 7,500 agents around the country. These agents also sell long term care and other types of policies through other managing general agents. Defendants AIG Life Insurance Company and American International Life Assurance Company of New York (collectively referred to as "AIG") are insurance companies doing business throughout the United States. American General Corporation ("American General") is a recently acquired subsidiary of AIG.

In 1997, AIG became interested in entering the long term care insurance field. Sun developed a long term care insurance policy to be offered by AIG and was given the exclusive right to market this and any other AIG long term care policy. Under this arrangement, Sun had nationwide authority and obligation to recruit sales agents and sell the policies. Sun sold no other product—only AIG's long term care insurance. AIG had the right to terminate the relationship upon written notice if it ceased selling long term care insurance.

AIG subsequently purchased SunAmerica, Inc. which was offering a long term care product sold by its agents. A dispute arose between AIG and Sun concerning whether Sun should be credited with the sales of the SunAmerica agents. To resolve this dispute, the parties entered into new agreements, two of which are at issue in this case: a Managing General Agent ("MGA") agreement and an Override Agreement. These new agreements provided that Sun was to remain the exclusive agent for all sales made by its producers at a commission rate of approximately seven percent. Sun would receive no commission on the sales of the former SunAmerica producers (referred to as "company producers"), but instead would receive a two percent override commission on their sales. It was further agreed that, if AIG purchased any other companies or existing blocks of long term care business, Sun's producers would be appointed as agents to sell the new long term care product and Sun would be offered "a separate and distinct Managing General Agent contract at the maximum compensation rates paid to any producers at the time by new business" for sales of the newly acquired long term care products. Again, AIG had the right to terminate the agreements in the event it ceased selling long .term care insurance. The contracts were to be construed according to Delaware law.

In 2001, AIG entered into an agreement to acquire American General which, at the time, was developing its own long term care product, GPC. AIG performed its due diligence during the summer of 2001 and the purchase was consummated at the end of August, 2001. Because AIG was experiencing rate problems with its own long term care product, LTC1 and LTC2, and considered the American General long term care product, GPC, to be superior, AIG decided to terminate sales of LTC1 and LTC2 and to continue developing GPC.

On September 28, 2001, AIG notified Sun that it was terminating sales of LTC1 effective October 1, 2001, in the State of California and October 30, 2001, in the remainder of the United States. On October 5, 2001, AIG notified Sun that it was terminating the sales of LTC2 effective November 30, 2001, and was terminating its existing agency agreements (the MGA agreement and the Override Agreement). On that same day, October 5, 2001, AIG offered Sun a separate and distinct Managing General Agent contract to sell GPC at the maximum commission rates offered by American General. Sun refused to accept the new agreement because 1) it was not on the same terms and conditions as its present MGA, 2) it did not designate Sun as the exclusive agent for its producers, and 3) it did not provide for the two percent override on the sales of the company producers.

Realizing that it needed product to sell, Sun began contacting other long term care insurance companies to explore selling their products and began preparations to file this lawsuit to force AIG to offer an agency agreement on the terms to which it thought it was entitled. On December 4, 2001, Sun filed this lawsuit seeking a Temporary Restraining Order, Preliminary Injunction, and damages. On December 13,

2001, this Court conducted a preliminary injunction hearing on Sun's Motion and, on December 21, 2001, issued an Order partially granting and partially denying Sun's Motion.

This Court determined that the existing MGA was terminated and that Sun was entitled to a new MGA for the sale of GPC, not on the same terms and conditions as its prior MGA, but on the best terms and conditions offered any existing agency for the sales of GPC, and that Sun's producers were to remain exclusive to Sun. The Override Agreement was terminated and Sun was no longer entitled to the two percent on the sales of GPC by the company producers. Pursuant to those parameters, AIG was ordered to add Sun's producers as selling agents for GPC.

During the month of January, 2002, AIG decided that it would withdraw entirely from the long term care insurance market. That included a decision to cease selling GPC. On February 14, 2002, AIG advised this Court and Sun of its decision and, after a ninety-day run-off period, terminated sales of GPC effective May 15, 2002.

### STANDARD OF REVIEW

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. *Id.* at 255, 106 S.Ct. 2505.

Once a party properly supports a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The evidence must be significantly probative to support the claims. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.,* 906 F.2d 559, 564 (11th Cir.1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Hoffman v. Allied Corp.,* 912 F.2d 1379 (11th Cir.1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir.1989).

When there has been an objection to the opinion of an expert witness, the Court is obligated to "make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning

or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786 (1993). A district court should not admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. *General Electric Company v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

### *LEGAL DISCUSSION*

Plaintiff claims that Defendants breached the contract by failing to promptly appoint Sun's agents to sell GPC which left Sun with no product to sell. Plaintiff claims as damages, not the loss of profits it would have earned from the sale of GPC policies until May 15, 2002, but the value of its entire business contending that the failure to appoint its agents caused the destruction of its distribution network. Plaintiff describes the inquiry on damages to be "(w)hat was Sun's distribution network worth?" (Page 3 of Plaintiff's Supplemental Memorandum). Plaintiff attempts to answer this query with the opinion of its expert, Mr. Buttner, a forensic accountant. Plaintiff describes Mr. Buttner's opinion (at page 4 of its Supplemental Brief in Opposition) to be a determination of the fair market value of the business:

> In his expert report, Mr. Buttner determined the fair market value of Sun's business by a) projecting the amount of revenue that Sun's network was capable of producing through sales of GPC, the Defendants' long term care product that was still on the market as of December 2001, and b) discounting that amount to reflect present value.

Mr. Buttner's projection is over a ten year period for new GPC policy sales—long after GPC was no longer available for sale—and thirty years of renewals. Plaintiff attempts to bolster the logic of this approach by offering the following hypothetical (found in footnote 5 of the same Memorandum) concerning the development of an "asking price:"

> The following hypothetical illustrates the correctness of Sun's position. Imagine that AIG and American General had complied with their obligations and promptly appointed Sun's producers to sell GPC following the American General merger. Imagine further that Sun then decided to sell its agency network as of December 2001, after AIG's withdrawal from the long term care insurance market. Under those circumstances, Sun and its potential purchaser would have arrived at an asking price by forecasting the network's future sales of American General's GPC product and adjusting that revenue stream to reflect present value. That is *exactly* what Mr. Buttner did in his expert report on Sun's damages. (Emphasis in original).

■ While it may be within the realm of possibility that a potential purchaser would agree that a seller's "asking price" should be determined by forecasting the seller's future sales over a ten year period and then reducing it to present value, it is highly unlikely. Regardless, an "asking price" is not the same as "fair market value." A seller may ask any price he or she chooses, but fair market value is " 'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.' " *United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973) (quoting Treas. Reg. § 20.2031–1(b)).

■ The value of a business depends upon the facts unique to that business and therefore appraisals tend to be factually intensive involving competing valuation methodologies. *Gonsalves v. Straight Arrow Publishers, Inc.,* 701 A.2d 357 (Del. 1997). Generally, those methodologies in-

volve consideration of three approaches: assets-based, market, and income. In valuing a business, the appraiser should consider each approach relative to the business in question and assign the appropriate weight to each of the values generated by the three approaches. *Dunn v. Commissioner of Internal Revenue,* 301 F.3d 339 (5th Cir.2002). Usual factors to be considered are: net worth (book value and/or market value of assets minus liabilities); evidence of recent sales of similar businesses or blocks of stock of similar businesses; whether the corporation is regularly traded on an exchange, is closely held or its stock has been traded at arms' length in close proximity to the valuation date; historic and prospective earning power and dividend-paying capacity; good will; position in the industry; management; and the economic outlook of the industry. *Dunn,* 301 F.3d at 350 (referring to Rev. Rul. 59–60, 1959–1 C.B. 237, § 4.01) and *Gonsalves,* 701 A.2d 357.

The opinion of Plaintiff's expert must be stricken for two reasons: first, Plaintiff's expert is not qualified in the area of business valuations for insurance agencies, and second, the report does not purport to value the business, only "do the math" (p. 5 of Plaintiff's Supplemental Memorandum) to calculate future net income from GPC reduced to present value.

■ Mr. Buttner is a forensic accountant, not a business appraiser. As an accountant, he has audited insurance companies, valued them and valued blocks of insurance business (previously sold policies of insurance companies which are withdrawing from an area of the market), but he has never valued any insurance agencies like Plaintiff's. (Buttner deposition, pages 325–326). Mr. Buttner does not have any background information on the long term care insurance industry. He has done no work in the long term care industry in the last ten years. (Buttner

depo., pp. 18–19). He did no research or analysis of the long term care market for this case. He only read some articles his staff pulled from the internet and does not know what searches his staff performed to come up with those particular articles. The articles totaled about fifteen pages of internet research. None of that research compared Plaintiff's business to sales of other like businesses. (Buttner depositions, pages 53–59). Mr. Buttner's report does not discuss the three approaches (assets-based, market, and income) and how they relate specifically to Plaintiff's business. He does not discuss the various factors that a business valuator should consider as they relate to weighting the three approaches in the valuation. He only calculates future income, based on certain assumptions, and then reduces that figure to present value. That is insufficient to support the valuation of a business.

■ Prospective earnings is but one factor to consider among others in using the income approach. The income approach also takes into account historical earnings, the corporation's stability, and risk factors in the business and its industry. *Universal City Studios, Inc. v. Francis I. duPont & Co.,* 334 A.2d 216 (Del.1975). That Sun sold only one product, for only one insurance company, under a contract subject to being terminated, are risk factors that cannot reasonably be ignored. But they were ignored by Mr. Buttner.

Plaintiff cites to two Florida cases to support the proposition that its loss of prospective profits should be recoverable: *Twyman v. Roell,* 123 Fla. 2, 166 So. 215 (1936) and *City of Treasure Island v. Provident Management Corp.,* 738 So.2d 357 (Fla. 2d DCA 1999). Since only *City of Treasure Island* deals with the valuation of a business, it will be discussed first.

In *City of Treasure Island*, a rental agent contracted with numerous owners of condominiums in one complex to serve as a rental agent to rent the units on a short-term basis to tourists. The City of Treasure Island, believing that this rental activity violated its zoning ordinances, obtained an injunction against the operation of the business. Three years later, the rental agent was successful in having the injunction lifted, but argued that its business had been entirely destroyed. To prove the value of its business at trial, the rental agent offered the opinion of a qualified expert, apparently without objection, who, because there were few, if any, comparable sales of such businesses to use as a benchmark for fair market value, relied upon the "total capitalized net cash flow" method. The expert described this approach as relying primarily (there is no mention in the opinion of the other factors, if any, upon which he relied) on predicted net income for a future period of ten years that is reduced to present value using a capitalization rate substantially in excess of the investment return on government bonds.

This Court finds *City of Treasure Island* to be unpersuasive. There the expert was a qualified business appraiser who explained why other valuation approaches were not used and there was no objection to the opinion. Here, the expert is not qualified to value an insurance agency, there is no explanation why other approaches to valuation (such as comparable sales or net worth) were not used, and there has been a timely objection by the opposing party. When an objection has been made to the admissibility of an expert's opinion, it is incumbent upon the trial court to examine the foundation of the opinion and exclude it if it is not grounded on appropriate principles and methodology. *General Electric Company v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

*Twyman* is a seminal case in Florida for the use of prospective profits as a measure of damages in a breach of contract case, an exception to the general rule that predicted profits of a commercial business are too speculative and dependent upon changing circumstances to warrant a judgment for its loss. *New Amsterdam Casualty Co. v. Utility Battery Mfg. Co.*, 122 Fla. 718, 166 So. 856 (1935). It does not deal with the valuation of property after its destruction. In *Twyman*, two parties entered into a joint venture to undertake a farming operation and divide the profits. One party was to provide money and the other was to provide money plus perform the farming. The second year of the agreement, the farmer planned to plant 50 acres of English peas, but the other party failed to come forward with his share of the money for the planting of the crop. That forced the farmer to miss the English pea season and plant other less profitable crops. At the end of the second planting year, the farmer dissolved the partnership and filed suit for an accounting, including his share of the lost profits that would have been received had the crop of English peas been planted as planned. The trial court disallowed any claim for prospective profits for the sale of crops that were never planted finding that, as a matter of law, it was speculative and conjectural. The Florida Supreme Court reversed and held that lost profits can be recovered if "the amount can be established with reasonable certainty, such certainty as [will satisfy] the mind of a prudent and impartial person." *Twyman*, 166 So. at 217.

The Supreme Court found the lost profits recoverable in *Twyman* because of the benefit of hindsight. It concluded that, since the suit was instituted after the close of the crop season, the lost profits were reasonably certain because the climatic and other conditions which so often materially affect crops were known. No as-

sumptions had to be made. The known facts were: the amount of land to be planted, a well-defined intention to plant English peas, pea seeds were available for planting, during the English pea season there were no weather conditions which would have seriously injured a crop, there was no prevalence of insects or diseases during that period, another nearby farm on land of the same general quality and character produced an average of 150 hampers per acre, the cost of production was known and evidence was given that English peas realized an average net profit of $1.50 per hamper that year. Based on these known quantities, the court allowed recovery for the loss of prospective profits caused by the breach.

Here, hindsight works to the Plaintiff's detriment. AIG is known to have ceased its sales of GPC as of May 15, 2002. Plaintiff's projection of lost profits is based on several assumptions which are not grounded on known facts, but speculation and conjecture on what might have happened after May 15, 2002. In such a case, Florida law is clear that future lost profits are not recoverable.

Florida law [1] requires that assumptions used to support the conclusions be reasonably certain, not mere best case scenario predictions. For example, when a defendant has the right to terminate the contract or sales of the product in issue, future events are uncertain. *Brough v. Imperial Sterling, Ltd.*, 297 F.3d 1172 (11th Cir.2002). In *Brough,* a plaintiff property manager attempted to prove lost future sales commission by introducing evidence that the defendant real estate investment company would likely have sold certain properties during the time period

in question. The plaintiff's lost future profits claim was deemed speculative and disallowed by the Eleventh Circuit because the defendant was not obligated to sell the properties.

Florida's Fourth District Court of Appeal has referred to lost profits arguments like Plaintiff's as a "for-want-of-a-nail" argument. *Halliburton Company v. Eastern Cement Corporation,* 672 So.2d 844 (Fla. 4th DCA 1996). In *Halliburton,* a buyer argued that if the goods sold, a single pneumatic cement pumping system, had been as warranted, it would then have purchased four additional systems and, then, after chartering a vessel for a long term, would have exploited the systems by entering the containerized cargo business. The jury accepted the argument and awarded damages representing lost profits from the proposed containerized cargo business with the four additional systems operating as planned. The Court rejected the damages as too remote and speculative. In rejecting the damages, the Court said at page 846:

> All that was offered was a hope of commercial fortune hanging from a thin thread of "what-ifs"—buoyed by the buyers after-the-fact testimonial conviction that success and profits would surely have been there for the taking.

> \* \* \* \* \* \*

> It is in short, as seller argues, the nail that lost the kingdom. To borrow from *Ohoud Establishment for Trade & Contracts v. Tri–State Contracting & Trading Corporation,* 523 F.Supp. 249 (D.N.J.1981), cited by seller:

>> The Court would have little difficulty in submitting the loss of the shoe, the

---

1. Although this case is to be decided under Delaware law, the Court will first examine Florida law since Plaintiff has relied on Florida cases. The law on this issue seems to be universal. Delaware law also requires that loss of future profits be established by substantial evidence and not be left to speculation. *Re v. Gannett Co., Inc.,* 480 A.2d 662 (Del.Super.1984).

horse, and probably the rider to a jury if caused by the sale of a defective nail or the failure to deliver the nail as agreed. The loss of the battle creates a doubtful question, but the loss of the kingdom is so remote as to bar its submission to a jury.

523 F.Supp. at 255. The Court added: "If the manufacturer of the nail becomes responsible for the loss of the kingdom, then we may not have any more nails." 523 F.Supp. at 257.

■ Turning to the assumptions used by Plaintiff's expert in this case, Sun's theory is that if its agents had been appointed to sell GPC on December 1, 2001, even though GPC was withdrawn from the market five and a half months later, Sun would have been "capable" of selling the amount of GPC business estimated in an internal planning document prepared by AIG during its due diligence period in deciding whether to purchase American General. That document projected potential savings to AIG over the next ten years based on a target sales projection of the GPC product. Sun's theory is that it is reasonable to assume the value of its business equals the present value of the potential profits based on AIG's estimated sales figures over a ten year period for sales and thirty years for renewals without regard to AIG's right to terminate the sales agreement.

Why ten years? Mr. Buttner chose ten years because Plaintiff's counsel asked him to use that period of time to be consistent with AIG's internal marketing projection, and calculated damages get very small after a ten year period because of reduction to present value, and ten years "seemed like a reasonable time as well for the production of a new product." (Buttner depo., p. 140). According to Mr. Buttner, nine years would also be reasonable, but seven or eight years probably would not be reasonable because, he opined, no one would

incur the cost it takes to build that kind of a nationwide agency force for just seven or eight years. (Buttner depo., p. 168). But, that is exactly what Sun did in this case. It built an agency to sell a new product that could be terminated at any time.

■ When an agreement contains contingencies that could plausibly have caused termination of the agreement, and termination could affect the duration of the business, lost profits estimates have been found too speculative. *Beverage Canners. Inc. v. Cott Corporation,* 372 So.2d 954 (Fla. 3d DCA 1979). Delaware, like Florida, allows evidence of future events (hindsight), to support or refute the assumptions underlying an expert's opinion. *Gonsalves,* 701 A.2d at 362. The reality shown by future events is that GPC was not sold after May 15, 2002, and it is unreasonable to now assume otherwise.

Hindsight tells us that other assumptions made by Mr. Buttner are also not supportable. Even though sales of GPC stopped, Sun also wants to assume it could have found some other company with which to do business on the same terms, selling the same product with the same success as projected by AIG for the GPC product. But, after receiving notice on October 5, 2001, that AIG was withdrawing LTC1 and LTC2 from the market, Sun contacted several other companies about selling for them, but did not contract with them because the commission schedule was not high enough, or it did not like the product, or the company would not give Sun an exclusive agreement to protect its agents. This included companies such as New York Life, Prudential, Mass Mutual, G.E. Capital, Bankers L & C, John Hancock, CNA, Unum, Penn Treaty, IDS Life, Life Investors, American Fidelity & Liberty, State Farm, Mutual of Omaha, AAL, Metropolitan, and Conseco. (Gayheart depo., pp. 88–103).

■ Further, Mr. Buttner's opinion is based on a projection of lost sales and renewals of GPC, not some other product of some other company. Hindsight has revealed that GPC was withdrawn from the market as of May 15, 2002. Any projection that GPC would be sold after that date or that another policy with the same terms, conditions, profit margins and sales penetration would be sold after May 15, 2002, is pure speculation. A lost profit damages award is improper where the profit comparison assumes post-termination contracts with other companies are similar to its pre-termination contract with the Defendant. *Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1326 (11th Cir.1998).

This case is a good example of the unreliability inherent in basing an opinion on a marketing estimate. These estimates were for a new product that AIG did not even own at the time. They were prepared in the process of conducting due diligence prior to completing the purchase of American General. AIG projected what profits it might make given certain assumptions that had not yet, and might never, come to pass. We now know with the benefit of hindsight the assumptions did not come to pass. Rather than reaping the hoped-for profits, AIG is no longer even selling the product. Thus, it is not reasonable to rely upon its marketing plan as a projection of actual profits. *Target Market Publ'g, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1146 (7th Cir.1998).

■ Finally, Mr. Buttner's lost profits projection erroneously excludes Mr. Gayheart's salary. In calculating Sun's expenses, Mr. Buttner assumed that Sun would cease paying Mr. Gayheart's salary. Accordingly, he reduced Sun's expenses thereby increasing his opinion of Sun's lost profits. This is improper because Sun's damage theory is to place a value on the business, not the amount of loss to Mr.

Gayheart individually. Since Mr. Gayheart is providing services to the corporation, were he to be removed, the business would have to fill his position with another executive of like quality. Absent a derivative claim attacking excessive compensation, an expert may not ignore salaries to create an alternative cost pattern to influence value. *Gonsalves*, 701 A.2d at 363.

## *CONCLUSION*

For the foregoing reasons, the Court determines that Mr. Buttner is not qualified to value the business of an insurance agency and his opinion is not grounded upon appropriate business valuation methodology or facts sufficient to support it. On this record, damages are nor recoverable beyond May 15, 2002, the date GPC was no longer sold. Therefore, the opinion of Mr. Buttner should be stricken.

It appears there will be no evidence of damages in the record once Mr. Buttner's opinion is stricken. Damages are a necessary element in an action for breach of contract. Proof of some loss, without proof of specific damages, entitles Plaintiff to recover nominal damages. *USH Ventures v. Global Telesystems Group, Inc.*, 796 A.2d 7 (Del.Super.2000).

It is therefore ORDERED AND ADJUDGED that:

1. Defendants' Motion for Partial Summary Judgment (Dkt.# 58) is GRANTED and the opinion of Mr. Buttner is hereby stricken.

2. The parties are each given fifteen (15) days to brief whether damages are otherwise demonstrated in the record or, if not, whether a trial is necessary in this matter for only nominal damages. The record may not be supplemented without leave of Court.