2015 DEC 21 AM 9: 02



# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| EAGLEVIEW TECHNOLOGIES, INC., a Washington corporation, | ) ) ) | No. 72644-7-I |
| Respondent | ) ) ) | DIVISION ONE |
| v. | ) ) | |
| YURI PIKOVER an individual; and 37 TECHNOLOGY VENTURES, LLC, A Delaware limited liability corporation, | ) ) ) ) | UNPUBLISHED OPINION |
| Appellants | ) ) | FILED: <u>December 21, 2015</u> |

SPEARMAN, C.J. — This dispute is over the valuation of dissenter shares of stock in EagleView Technologies, Inc. (EagleView). Appellants Yuri Pikover and 37 Technology Ventures, LLC (collectively, the Dissenters) were shareholders of EagleView who dissented to the company's merger with Pictometry International Corporation (Pictometry). The parties asked the trial court for a determination of the shares' value under chapter 23B.13 RCW. After reviewing the evidence, the trial court concluded that the fair value of the shares was represented by the valuation prepared by EagleView's expert witness. The Dissenters appeal. We affirm the trial court.

## FACTS

Respondent EagleView Technologies, Inc. (EagleView) was founded in 2007. The company provides aerial roof measurement services that allow insurance companies and contractors to estimate the costs of repair or replacement of rooftops.

EagleView's business grew rapidly–from revenues of $1.4 million in 2008 to $48.5 million in 2012.

Pictometry was EagleView's predominant supplier of images from 2008 until the two companies merged in 2013. Prior to the merger EagleView had a five-member board of directors, including CEO Chris Barrow, Chris Pershing, and three outside investors. Appellants Yuri Pikover and 37 Technology Ventures, LLC (37TV) (collectively, the Dissenters) are former EagleView shareholders who dissented from EagleView's January 7, 2103 merger with Pictometry. Pikover is the managing director and sole member of 37TV and sat on EagleView's board of directors from 2008 until 2012.

Pictometry provided the high quality orthogonal and oblique images that EagleView needed to generate accurate roof measurements. In 2012, Pictometry had the only access to airspace and high quality image library that could meet EagleView's needs.

In 2010, EagleView and Pictometry entered into a new contract that required EagleView to pay higher royalties for the use of Pictometry's images. The contract expired in 2015. In late 2010 or early 2011, Pictometry expressed interest in acquiring EagleView. Later in 2011, Pictometry acquired one of EagleView's competitors, GeoEstimator.

In early 2012, EagleView was for sale. The company received a number of offers, ranging as high as $350 million. On June 11, 2012, EagleView and Pictometry executed a term sheet with the intention to merge the two companies. At that point,

EagleView was valued at $250 million. After the term sheet was executed, EagleView's three independent directors, including Pikover, were removed by shareholder vote.

During the merger talks, the relationship between EagleView and Pictometry began to sour. At one point Pictometry threatened to terminate the contract with EagleView and offer its own roof reports through GeoEstimator. Pictometry also had concerns about whether EagleView had adhered to the terms of the contract. As a result, Pictometry began to limit EagleView's access to its newer imagery and to design a new product that would not be available to EagleView. If the merger did not go through, Pictometry intended to terminate its contract with EagleView. Some of EagleView's customers had already started looking to Pictometry for roof reports. EagleView looked for an alternate source for its images, but was unable to find a provider that could match Pictometry's capabilities.

EagleView and Pictometry eventually negotiated a stock-based, 50/50 merger of equals and finally executed an agreement on December 18. 2012. The merger closed on January 6, 2013.

On January 30, 2013, the Dissenters notified EagleView that they were asserting their dissenters' rights. EagleView sent response letters and checks reflecting the fair value of the Dissenters' shares plus interest on March 1, 2013. Based on an estimated value of $250 million, the Dissenters expected to receive $12 or more per share. They received $2.75-$3.65 per share, with interest at a rate of 0.05 percent, reflecting a value of approximately $67 million.

Between June 2012 and January 2013, EagleView had additional difficulties that affected its net value. Two of EagleView's patents were under reexamination and

3

therefore effectively unenforceable as a result of an infringement lawsuit. EagleView was also involved in litigation with its software provider, Xactware, from which EagleView derived about 30 percent of its revenue.

In early 2012, EagleView had prepared a three year earnings forecast that projected revenue for 2012, 2013, and 2014. EagleView fell short of its most conservative estimate in 2012, however, only obtaining $48.5 million in revenue when it had projected at least $60 million.

EagleView determined that the fair value of its common stock in late 2012 was $2.75 per share and $3.65 for its preferred stock. It arrived at this estimate after considering a number of factors including the redemption rights of the common stock, the current value of shares, the price paid for each share in its repurchase offer, strike price for stock options, estimated fair value of a share, and the business considerations of the board of directors.

An estimate prepared by Alvarez & Marsal determined that the fair value of EagleView's common stock on December 30, 2012 was $2.53 per share and $3.89 per share for preferred stock. The report, prepared in June 2013, used figures for 2014 and 2015 that had carried over from the initial 2012 forecast, but they were not adjusted to account for EagleView falling short of the 2012 forecast by almost thirty percent.

In September 2012, Houlihan Lokey valued EagleView at $187-$294 million, with a midpoint value of $239 million. Houlihan Lokey requested projections from EagleView, but when EagleView did not provide them, it based the valuation on a financial model created by Pictometry.

4

On March 29, 2013, the Dissenters informed EagleView that they rejected their estimate of fair value of the shares and submitted a valuation prepared by FTI Consulting. This report concluded that the fair value of EagleView's shares as of January 4, 2013, was $12.14 per share, based on a total value of $296.5 million. EagleView filed suit on May 24, 2013, to determine the fair value of the shares.

EagleView obtained a report by Neil Beaton that valued the company at $88.4 million, or $3.94/$4.88 per share, which was slightly higher than its original estimate. On December 20, 2013, EagleView wrote another check to the Dissenters that reflected the updated value of the shares. In January 2014, Verisk Analytics purchased the combined company for $650 million, with the Dissenters and other shareholders receiving $14.85 per share.

At trial, EagleView presented testimony on valuation from its expert, Neil Beaton, while the Dissenters presented testimony from their expert, Ellen Larson. The trial court considered the testimony and the various valuations, and ultimately valued the Dissenters' shares at $3.94 per share for common stock and $4.88 for preferred stock as of January 6, 2013. These values corresponded to the estimates provided by Beaton. Because EagleView had already paid the Dissenters that amount, no additional fair payment was due. The trial court also awarded interest on shares at 5.75 percent, instead of EagleView's estimate of 0.05 percent. The Dissenters were entitled to an amount equivalent to an additional 5.70 percent interest on the fair value amounts paid on February 28, 2104 and December 20, 2014. Finally, neither party was awarded fees.

The Dissenters appeal.

## DISCUSSION

The parties agree that in the absence of any legal errors, abuse of discretion is the applicable standard of review. But the Dissenters argue that because their claims of error implicate legal issues under chapter 23B.13 RCW, our review should be de novo. The Dissenters contend that issues such as "what evidence is relevant in the valuation phase of a trial? What is the nature of a trial court's independent review of value?" present questions of law. Reply Brief at 12. We disagree. The crux of the Dissenters' argument is that the trial court erred when it agreed with EagleView's expert. Because this is not a legal question, and the Dissenters have not provided any other basis for de novo review, our review is for an abuse of discretion.

Independent Objective Analysis of Value–RCW 23B.13.300

The Dissenters argue that the trial court failed to conduct an independent, objective analysis as required by RCW 23B.13.300. Br. of Appellant at 18. According to them, the trial court "rel[ied] entirely on the Beaton analysis," and "ignored other independent sources of fair value for the dissenter shares." Brief of Appellant at 36-37. EagleView argues that the trial court conducted an independent evaluation that is supported by the record.

Under the Washington Business Corporation Act, (WBCA) Title 23B RCW, shareholders are "entitled to dissent from, and obtain payment of the fair value of the shareholder's shares" when a corporation performs a corporate action such as a merger with another company. RCW 23B.13.020(1). If a dissenter is dissatisfied with the corporation's estimate of the fair value of the shares, he or she may provide the corporation with his or her own estimate of the fair value of the dissenters' shares. RCW

23B.13.280(1). If the corporation contests the estimate, it must file for an appraisal proceeding to determine the "fair value of the shares and accrued interest." RCW 23B.13.300(1). Fair value is defined as:

> [T]he value of the shares immediately before the effective date of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable.

RCW 23B.13.010(3). RCW 23B.13.020 is designed to provide dissenters fair and accurate compensation for their shares, recognizing that corporations have both the power and the right to perform such transactions. Sound Infiniti, Inc. v. Snyder, 169 Wn.2d 199, 210, 237 P.3d 241 (2010). The court makes the ultimate valuation decision in a dissenter's rights action. SentinelC3, Inc. v. Hunt, 181 Wn.2d 127, 142, 331 P.3d 40 (2014).

Both parties cite Gonsalves v. Straight Arrow Publishers, Inc., Del. Supr., 701 A.2d 337,359 (1997), in which the trial court failed to conduct an independent valuation because it announced in advance that it intended to choose between the two appraisals presented. Relying on Gonsalves, the Dissenters argue that the trial court's adoption of Beaton's estimate violated its duty to conduct an independent valuation. This duty prohibits the trial court from "adopt[ing] at the outset an 'either-or' approach, thereby accepting uncritically the valuation of one party. . . ." In re Appraisal of Metromedia Int'l. Group, Inc., 971 A.2d 893, 899-900 (Del. Ch. 2009). The Dissenters cite to nothing in the record, however, indicating that the trial court took an "either-or" approach at the outset of trial, nor do they show that it "accepted uncritically" the valuation presented by EagleView. They argue that the trial court's Conclusions of Law B-C—ten pages of

discussion about the two expert valuations—demonstrate that it "simply evaluated the opinions of the parties' witnesses and chose to credit one over the other." Br. of Appellant at 39. We disagree.

The trial court's concurrence with Beaton's analysis is not a per se failure to conduct an independent valuation. The fact that the trial court ultimately agreed with one of the experts does not diminish the independent nature of its valuation. When parties offer conflicting evidence on the value of an asset, the trial court may adopt the value asserted by either party or any value in between. In re Marriage of Soriano, 31 Wn. App. 432, 435, 643 P.2d 450 (1982). Similarly, under Delaware's statutory scheme, a trial court "has the discretion to select one of the parties' valuation models as its general framework or to fashion its own. M.G. Bancorporation, Inc. v. Le Beau, Del Supr., 737 A.2d 513, 525-26 (1999). The Delaware Supreme Court found that it was "entirely proper for the Court of Chancery to adopt any one expert's model, methodology, and mathematical calculations, in toto, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record." Id. at 526.

The Dissenters set forth numerous additional arguments as to why the trial court's valuation was not independent and otherwise flawed. They argue that the trial court should have given more consideration to conflicting evidence, such as the Houlihan Lokey and Alvarez & Marsal valuations. They also assign error to the trial court's conclusion that Beaton's valuation "was more reasonable than Larson's expert valuation." Br. of Appellant at 39. The Dissenters argue that the trial court "ignored independent indicia of EagleView's value," because in light of the other estimates of value, the trial court's valuation "simply made no sense. . . ." Id. at 42-43.

Property valuation is a determination to be made by the trier of fact. Worthington v. Worthington, 73 Wn.2d 759, 762, 440 P.2d 478 (1968). An appellate court does not substitute its judgment for that of the trial court in a factual dispute over the valuation of property. Id. Under chapter 23B.13 RCW, "the word 'value' contemplates a consideration of all facts and circumstances pertinent to a particular case." Petition of Northwest Greyhound Lines, Inc. v. McCornack, 41 Wn.2d 672, 680, 251 P.2d 607 (1952). There are no hard and fast rules for determining fair value of dissenters' shares; such determination must take into account the various approaches to evaluating corporate assets, earnings and business prospects without regard to the events that triggered the dissent. Columbia Mgmt. Co. v. Wyss, 94 Or. App. 195, 765 P.2d 207 (1988). A valuation approach "must include proof of value by any techniques or methods which are generally considered acceptable in the financial community. . . ." Weinberger v. UOP, Inc., 457 A.2d 701, 713 (Del. 1983). The facts of the case determine which factors are relevant and which valuation methods are appropriate. Bell v. Kirby Lumber Corp., 413 A.2d 137, 143 (Del. 1980).

The Dissenters propound a number of arguments as to why the trial court should have disregarded Beaton's estimates. They argue that Beaton was not independent, because it had recently performed valuations for EagleView. They also argue that Beaton overemphasized future risks, that it improperly used the subject company transaction methodology, and that it failed to add a premium to stock prices.

EagleView disagrees, arguing that the trial court was within its discretion to consider factors such as the risk of Pictometry acquiring a competitor and terminating contract, the failure to secure an additional image source, the risk from litigation with

Xactware and over EagleView's patents, the failure of its underwriting project, and the overestimated revenue from insurance carriers. According to EagleView, the trial court was also permitted to disregard other indicia of value if the bids were outdated or didn't reflect fair value.

We agree with EagleView. In <u>MPM Enterprises, Inc. v. Gilbert</u>, 731 A.2d 790, 796 (Del. 1999), the Delaware Supreme Court held that "[a] trial court, in its discretion, need not accord any weight to such values when unsupported by evidence that they represent the going concern value of the company at the effective date of the merger or consolidation." In this case, the trial court heard testimony from both parties' experts. It concluded that Larson's valuation opinion was less credible because the underlying data upon which she relied "was outdated by several months." CP at 100. The court also considered the testimony of both experts regarding the use of the subject company transaction methodology and the stock pricing of comparable companies. It concluded that Beaton's methodologies were "widely-accepted" by experts in the field, that he relied on "known and knowable facts adduced by EagleView's management" and as a result, "his analysis is reliable and helpful." CP at 99. These determinations are well within the trial court's discretion. We reject the Dissenters' arguments because they amount to no more than disagreement with the trial court's analysis and ultimate adoption of Beaton's valuation. We will not substitute our judgment for that of the trial court nor will we reweigh evidence on appeal. <u>In re Marriage of Greene</u>, 97 Wn. App. 708, 714, 986 P.2d 144 (1999).

Admission of Evidence Relevant to Request for Fees

The Dissenters argue that the trial court erred in admitting evidence of conduct because the trial court "fell prey to EagleView's effort to interject irrelevant considerations into the case" and entered findings about the Dissenters' conduct "in connection with its valuation decision." Br. of Appellant at 29-30. The Dissenters cite EagleView's trial brief, cross examination, opening statement and closing argument as containing multiple attempts to "demonize Pikover" and draw attention to his "revenge motivation." Br. of Appellant at 16. EagleView argues that the trial court was allowed to consider the evidence at trial because it was relevant to whether fees were to be awarded under the statute.

We review a trial judge's evidentiary rulings for abuse of discretion. Univ. of Wash. Med. Ctr. v. Dep't. of Health, 164 Wn.2d 95, 104, 187 P.3d 243 (2008). We will not reverse such a decision unless it is manifestly unreasonable or based on untenable grounds or untenable reasons. In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

RCW 23B.13.310(2) states that "[t]he court may assess the fees and expenses of counsel and experts for the respective parties, in amounts the court finds equitable: (b) Against either the corporation or a dissenter, in favor of any other party, if the court finds that the party against whom the fees and expenses are assessed acted arbitrarily, vexatiously, or not in good faith with respect to the rights provided by chapter 23B.13 RCW." Such a finding would require consideration of evidence of the parties' conduct. As a result, evidence of Pikover's conduct is therefore relevant to EagleView's request for an award of fees.

The Dissenters argue that this highly prejudicial evidence 'had no place in the trial on fair value" but should have been addressed in a separate proceeding. Br. of Appellants at 30. According to the Dissenters, CR 54(d) prohibits a court from hearing a fee request in the same proceeding. EagleView disagrees and argues that nothing prohibits fee requests from being heard in the same proceeding. EagleView also argues that the Dissenters waived their right to raise this argument when they did not object at trial or request a separate hearing.

Under CR 54(d)(2), "[c]laims for attorneys' fees and expenses, other than costs and disbursements, shall be made by motion unless the substantive law governing the action provides for the recovery of such fees and expenses as an element of damages to be proved at trial." If a statute appears to conflict with a court rule, the Supreme Court will first attempt to harmonize the two and give effect to both. City of Fircrest v. Jensen, 158 Wn.2d 384, 394, 143 P.3d 776 (2006). If they cannot be harmonized, the court rule will prevail in procedural matters and the statute will prevail in substantive matters. Putnam v. Wenatchee Valley Med. Ctr., P.S., 166 W.2d 974, 984, 216 P.3d 374 (2009). Substantive law "'creates, defines, and regulates primary rights,'" while procedures involve the "'operations of the courts by which substantive law, rights, and remedies are effectuated.'" Id. (citations omitted).

Here, RCW 23B.13.310 allows for an award of fees only if certain conditions are met; and those conditions must be proved at trial. We find no error in the trial court's decision to address the issue of fees at trial. There is nothing in CR 54(b) that precludes a fee request from being heard at trial in a dissenters' rights case such as this, where

the substantive law provides for the recovery of fees as an element of damages to be proved at trial.

The Dissenters also contend that the trial court was "plainly influenced in its valuation decision by this illicit evidence because it discussed such evidence in its findings of fact on the valuation decision." Reply Br. at 9-10. EagleView maintains there was "zero evidence in the trial court's decision that . . . [it] considered the evidence of [Pikover's conduct] . . . for any purpose other than EagleView's request for fees." Br. of Respondent at 41.

The Dissenters cite the trial court's findings of fact, arguing that the valuation discussion included improper consideration of Pikover's conduct. There is no indication in the record, however, that the trial court considered these factors in its valuation decision. While the trial court made almost four pages of findings of fact regarding Pikover's conduct, none of these findings were mentioned as factors affecting its valuation decision. In the "Conclusions of Law" section, the trial court discussed the expert testimony, valuation methodology, assumptions, growth rates, discount rates, risk factors, and other considerations. Pikover's conduct was only mentioned in reference to EagleView's request for costs and fees. The trial court found that EagleView had failed to prove by a preponderance of evidence that Pikover "dissented solely to get revenge for being fired and to prove he was wronged." Clerk's Papers (CP) at 58. The trial court also stated that EagleView "proved that Mr. Pikover lacked information after his removal," and that "[i]n the absence of such inside information, it is understandable that a director could dissent from the new valuation presented to it by Eagle View [sic]." CP at 59. The record shows that evidence of Pikover's conduct was

13

discussed separately from trial court's valuation decision. As a result, we cannot say that Pikover was prejudiced by the evidence.

Denial of Fees Under RCW 23B.13.310

Lastly, the Dissenters argue that they should have been awarded fees under RCW 23B.13.310 because EagleView failed to comply with the requirements of chapter RCW 23B.13 and/or acted vexatiously, arbitrarily, or in bad faith. The Dissenters also argue that the trial court erred by failing to make express findings of fact and conclusions of law with regard to its denial of fees to the Dissenters. EagleView argues that the supreme court in AllianceOne Receivables Management, Inc. v. Lewis, 180 Wn.2d 389, 393, n.1, 325 P.3d 904 (2014), recently determined that findings of fact and conclusions of law are not required when a trial court denies attorney fees. Even if it were required, EagleView argues that the trial court entered sufficient findings to support a denial of fees. The Dissenters claim that there is no distinction between an award and a denial and that the trial court should have made a record when it denied fees.

We review a trial court's denial of a motion for attorneys' fees for abuse of discretion. Nakata v. Blue Bird, Inc., 146 Wn. App. 267, 276, 191 P.3d 900 (2008). A trial court abuses its discretion when it bases its denial on untenable grounds or reasons. Id. We use the same standard to review a trial court's refusal to award sanctions under CR 11 or RCW 4.84.185. Skimming v. Boxer, 119 Wn. App. 748, 754, 82 P.3d 707 (2004). In Skimming, the court expressly stated that a court "need not enter findings when the request for CR 11 sanctions is rejected. It is the decision to impose the sanction that must be supported by the record." Id. at 755. Here, the trial court made

no findings that EagleView failed to comply with RCW 23B.13.200-.280 or that EagleView acted in bad faith. In the absence of such findings, the Dissenters were not entitled to an award of fees. A trial court is "not required to enter negative findings or findings that a certain fact has not been established." Gen. Indus., Inc. v. Eriksson, 2 Wn. App. 228, 229, 467 P.2d 321 (1970).

The Dissenters argue that EagleView did not provide "fair value" for the Dissenters' share as mandated by the statute and that it failed to pay fair value within the statutory time frame. RCW 23B.13.250(1) requires a corporation to pay each dissenter the fair value within 30 days of the later of the effective date of the corporate action, or the date the payment demand is received. The Dissenters submitted a demand for payment on January 30, 2013. EagleView paid what it determined to be fair value on March 1, 2013, within 30 days of the demand. EagleView later revised its estimate and paid an additional amount to the Dissenters on December 20, 2013.

Second, the Dissenters argue that EagleView acted in bad faith because it did not offer the Dissenters a higher amount for its shares, applied a low interest rate, revised its estimates of value, and failed to respond to their demand letter. But they cite no authority for their contention that this conduct amounts to bad faith under the statute. There is no basis for finding an abuse of discretion when the trial court declined to award fees in the absence of any finding that EagleView acted in bad faith or failed to comply with RCW 23B.13.310.

Finally, the Dissenters request an award of fees and costs on appeal. Because they are not the prevailing party in this appeal, we decline to award fees and costs.

Affirmed.

Spearman, C.J.

WE CONCUR:

Trickey, J.

Leach, J.