# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| KING AND MOCKOVAK EYE CENTER, INC., P.S., a Washington professional service corporation; and CLEARLY LASIK, INC., a Nevada corporation,<br><br>                              Respondents,<br>       v.<br><br>MICHAEL MOCKOVAK, M.D., an individual,<br><br>                              Appellant. | No. 79290-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

LEACH, J. — Michael Mockovak appeals the trial court's valuation of his shares of cancelled stock in King & Mockovak Eye Center (KMEC). For the first time on appeal, he claims the trial court should not have considered off-book surgical fees as debt in this valuation. But, even had Mockovak preserved this claim for review, substantial evidence supports the trial court's findings that the off-book surgical fees were a debt and the shares had a negative value. These findings support its conclusion that KMEC did not owe Mockovak anything for his shares. We affirm.

Citations and pincites are based on the Westlaw online version of the cited material.

## FACTS[1]

Joseph King and Michael Mockovak practiced Lasik eye surgery together. By 2009, they held equal shares in several corporations, including KMEC, a Washington professional service corporation, Clearly Lasik, Inc. (CLI), a Nevada corporation, and a third corporation organized under the laws of British Columbia. KMEC owned and operated three practices in Renton, Vancouver, and Kennewick, Washington. "The other corporations owned and operated eye surgery practices in Canada." Christian Monea became the chief executive officer for KMEC and CLI in 2008.

The practices struggled during the 2008 and 2009 recession. To resolve conflict between them, King and Mockovak scheduled an arbitration to divide the business assets in late December 2009. On November 12, 2009, the FBI arrested Mockovak for trying to arrange King's murder. While released on bail, Mockovak withdrew $100,000 from the KMEC bank account, leaving the practices unable to pay their staff and bills. After his arrest, Mockovak never practiced again and never contributed any funds to pay the debts of KMEC and CLI. The Washington State Medical Quality Assurance Commission (Commission) suspended his license in January 2010. In 2011, a trial court convicted and sentenced Mockovak for attempted murder, attempted theft, and other crimes. The Commission permanently revoked his license in March 2012.

---

[1] This opinion adopts facts from the trial court's unchallenged findings of fact. An appellate court treats unchallenged findings as true on appeal. Nelson v. Washington State Dept. of Labor and Industries, 175 Wn. App. 718, 723, 308 P.3d 686 (2013). It also adopts facts from King & Mockovak Eye Ctr., Inc., P.S. v. Mockovak, No. 74544-1-I slip op. at 26 (Wash. Ct. App. October 30. 2017) (unpublished) http://www.courts.wa.gov/opinions/pdf/745441.PDF, rev. denied King & Mockovak Eye Ctr., Inc., P.S. v. Mockovak,190 Wn. 2d 1020, 418 P.3d 794 (2018).

After Mockovak's arrest, King was KMEC's only practicing surgeon. In January 2010, King stopped performing surgeries for KMEC and formed King Lasik. He was its only shareholder. He used revenue from King Lasik to pay down KMEC and CLI's debts.

## Procedural History

In November 2009, KMEC and CLI sued Mockovak, alleging, among other things, breach of fiduciary duty. Mockovak counterclaimed and asserted third-party claims against King and Monea for fraud. On behalf of CLI and KMEC, Mockovak also asserted derivative claims of breach of fiduciary duty, conversion, unjust enrichment, and conspiracy against King, Monea, and King Lasik.

The trial court made the following pretrial rulings:

(a) Mockovak and King each owned 50 percent of the shares in KMEC, (b) with the suspension of his medical license, Mockovak became ineligible to continue owning his shares in KMEC, and (c) Mockovak was to be paid the fair value of his cancelled shares as of January 27, 2011 (i.e., one year and one day after Mockovak's medical license was suspended).

Mockovak did not challenge these decisions on appeal.

The trial court dismissed Mockovak's derivative claims on behalf of KMEC on partial summary judgment. It also dismissed King's counterclaim of intentional injury to others and King Lasik's claim of unjust enrichment on partial summary judgment. Finally, the trial court denied Mockovak's request that the court bifurcate the trial and value his cancelled KMEC shares before the jury considered the rest of the case.

The trial started in November 2015. The jury heard Mockovak's claims of fraud, conversion, unjust enrichment, and conspiracy, and KMEC and CLI's claim of

breach of fiduciary duty. The trial court granted Mockovak's motion to dismiss King's breach of contract claim, in part, as barred by the statute of frauds.[2]

Both parties called expert witnesses to testify about the value of Mockovak's cancelled KMEC shares. King called Doug McDaniel, a forensic accountant and expert in business valuation. He reviewed financial records, market transactions, and depositions of other experts, owners, or buyers. He also interviewed Monea and King.

McDaniel used two valuation dates for KMEC. The first date was January 27, 2011, which was the statutory date of valuation. The second date was December 31, 2009, which was just after Mockovak's arrest. McDaniel described the "net asset," "income," and "market" approach methods used in business valuations. He testified he used the "net asset" approach, which he considered "the only applicable approach," because KMEC was a "severely impaired business" and was not a going concern. McDaniel included the off-book unpaid surgery fees accruing in 2009 because "they were acknowledged as debt by . . . King and everyone that [McDaniel] had talked to" including Monea. He valued KMEC at negative $474,110 on December 31, 2009. He valued KMEC at negative $467,168 on January 27, 2011. Mockovak did not object to McDaniel's testimony.

On cross-examination, McDaniel testified about the good will component of the valuation, "King had good will and . . . Mockovak was arrested and became a felon, and so there was no good will." And, he said that if "you take [ ] King out of it, the only value related to those practices is net asset value." McDaniel said he reviewed whatever was

_____

[2] The court allowed King to try to prove the existence and termination of a partnership with Mockovak but did not allow him to request an award of damages for breach.

"considered to be an asset of the company . . . in the financial statements, or acknowledged" to be an asset.

Mockovak called Lorraine Barrick, a forensic and certified public accountant, and an expert in business valuation. She reviewed case pleadings, depositions, financial information for the practices and holding companies, King's tax returns, publicly available sales documents for comparable practice and private transactions, and communications between the parties and other third parties. Barrick also conducted industry and economic research, interviewed King, and reviewed other valuations.

Barrick used the "income" and "market" approaches to value the shares. She calculated the value of Mockovak's half-share in the combined businesses at $2,103,244 on December 31, 2009, and $2,441,290 on October 31, 2012. She valued Mockovak's half-share in KMEC at December 31, 2009 at $845,186. She considered "cash flow from King LASIK" in her analysis of the value of the business. She did not include the off-book surgical fees because she did not "feel like the owners treated [them] as liabilities of the company." Barrick also calculated accrued interest at 5.25 percent on the value for Mockovak's shares from February 28, 2011 through the date of trial resulting in $209,340.

Barrick did not value the KMEC shares as of the statutory date of January 27, 2011 because "there were no actual results for KMEC after December 31, 2009." Barrick's work papers show KMEC's net income in 2010 at negative $106,185.28. She admitted on cross-examination that the legal entity known as KMEC had no positive income.

Verdict and Post-verdict

On its special verdict form, the jury concluded that: (1) Mockovak "breached one or more fiduciary duties" to KMEC and CLI but awarded no damages for the breach, (2) a partnership existed and that Mockovak made it "not reasonably practicable to carry on the business in partnership" or he engaged "in wrongful conduct that adversely and materially affected the partnership business," and (3) the value of Mockovak's shares in KMEC as of January 27, 2011 was negative $233,584. The jury rejected all of Mockovak's individual claims and his derivative claims on behalf of CLI.

After the trial court entered a final judgment, Mockovak appealed and King cross-appealed. On appeal, this court decided the trial court should not have allowed the jury to determine the value of the shares because RCW 23B.13.300 requires the court to do this. We ordered the trial court on remand to determine the value of Mockovak's cancelled KMEC shares based upon the evidence already presented at trial.

On remand, the trial court entered findings of fact and conclusions of law. It found that the "fair value of Mockovak's cancelled KMEC shares, as of January 27, 2011 was negative $233,584." It concluded "KMEC [was] not required to make any payment to Mockovak to purchase the cancelled shares. Nor [was] there any interest due on the unpaid purchase price."

King voluntarily dismissed his breach of contract claim and asked the court to enter a second amended final judgment. The court granted his request and entered a second amended final judgment on November 20, 2018.

Mockovak appeals.

**STANDARD OF REVIEW**

An appellate court considers unchallenged findings as true on appeal.[3] When a party challenges findings of fact and conclusions of law, the appellate court limits its review to determining whether substantial evidence supports the trial court's findings and whether those findings support its legal conclusions.[4] "Substantial evidence exists if a rational, fair-minded person would be convinced by it."[5] Though the trier-of-fact is free to believe or disbelieve any evidence presented at trial, "Appellate courts do not hear or weigh evidence, find facts, or substitute their opinions for those of the trier-of-fact."[6] This court reviews conclusions of law, "including those mistakenly characterized as findings of fact, de novo."[7]

**ANALYSIS**

Mockovak contends the trial court did not correctly value his shares in KMEC. But, his entire argument relies upon a challenge to evidence considered by the trial court that he did not object to in the trial court. Under RAP 2.5(a), appellate courts generally decline to review issues raised for the first time on appeal.[8] "The reason for this rule is to afford the trial court an opportunity to correct any error, thereby avoiding unnecessary appeals and retrials."[9] To preserve an evidentiary issue for appellate

---

[3] Nelson v. Washington State Dep't. of Labor and Indus., 175 Wn. App. 718, 723, 308 P.3d 686 (2013).

[4] Panorama Village Homeowners Ass'n v. Golden Rule Roofing, Inc., 102 Wn. App. 422, 425, 10 P.3d 417 (2000).

[5] In re the Estate of Palmer, 145 Wn. App. 249, 265, 187 P.3d 758 (2008).

[6] Quinn v. Cherry Lane Auto Plaza, Inc., 153 Wn. App. 710, 717, 225 P.3d 266 (2009) (citing Thorndike v. Hesperian Orchards, Inc., 54 Wn.2d 570, 572, 343 P.2d 183 (1959)).

[7] In re Estate of Haviland, 162 Wn. App. 548, 561, 255 P.3d 854, 861-62 (2011).

[8] Roberson v. Perez, 156 Wn.2d 33, 39, 123 P.3d 844 (2005).

[9] Smith v. Shannon, 100 Wn. 2d 26, 666 P.2d 351 (1983).

review, the party must have objected at trial. The specific objection made at trial must be the basis of a party's assignment of error on appeal.[10]

In an unchallenged finding, the trial court stated that King's expert, McDaniel, testified "that as of January 27, 2011, KMEC had a negative value of $467,168." In findings challenged for the first time here, the trial court determined that McDaniel's analysis "took into account the proper valuation factors and applied the appropriate valuation method" and that the expert properly included "the surgical fees owed to King and Mockovak in the net asset valuation calculation" because it was "a debt acknowledged by the interested parties." The court, also in an unchallenged finding, stated that Barrick's valuation was "not helpful to the court." In a finding challenged here, the trial court determined based on this analysis, that the fair value of Mockovak's cancelled KMEC shares was negative $233,584, which is 50 percent of the negative $467,168 identified by McDaniel as the value of all of the shares. In its challenged conclusion of law, the trial court determined that KMEC was "not required to make any payment to Mockovak to purchase the cancelled shares" and that there was no interest due.

Mockovak primarily challenges the court's findings and conclusions based on McDaniel's testimony. But, Mockovak did not object to or move to strike this testimony. Because Mockovak did not object to the testimony at trial, we affirm without considering the merits of his arguments. His arguments also lack merit.

---

[10] State v. Guloy, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985).

<u>The Trial Court Did Not Err in its Valuation of KMEC Shares</u>

If we consider the merits of Mockovak's claim, that the trial court should not have considered unpaid surgeon fees when valuing KMEC, it fails. And, he does not show that the trial court erred in concluding that KMEC did not owe Mockovak anything for his cancelled shares.

If a shareholder becomes ineligible to own shares in a Washington professional service corporation, the corporation must transfer, cancel, or redeem the shares within 12 months.[11] If the corporation does not do this, the shareholder is deemed to have exercised the right to dissent under 23B.13 RCW.[12] The shareholder is then entitled to payment of fair value for those shares under RCW 23B.13.250.[13] If the corporation does not pay the shareholder, a court will determine the fair value of the shares.[14]

Mockovak challenges the court's findings of fact identifying the unpaid surgical fees as debts for purposes of valuation. Mockovak contends these findings of fact are actually conclusions of law that this court should review de novo. He asserts, alternatively, that substantial evidence does not support the findings of fact. We disagree.

In <u>Clark v. Clark</u>, the court identifies the determination of whether a party owes a debt to an individual as a question of fact in appellate court reviews for substantial evidence.[15] Mockovak cites no persuasive authority to the contrary.[16] So, we conclude

---

[11] RCW 18.100.116.
[12] RCW 18.100.116(2).
[13] RCW 18.100.116(2).
[14] RCW 23B.13.280, RCW 23B.13.300.
[15] Clark v. Clark, 72 Wn. 2d 487, 491-92, 433 P.2d 687 (1967), <u>M.P.M. Enterprises, Inc. v. Gilbert</u>, 731 A2d 790, 797-98 (1999).

these are findings and review them to determine whether they are supported by substantial evidence from the record.

Mockovak challenges all but the final seven words of the finding stating "Coming out of the 2008-2009 global recession, KMEC and the other corporations were collectively more than $2.8 million in debt. They owed King and Mockovak almost $1.4 million in unpaid surgical fees and owed third parties more than $1.47 million." He also challenges the finding stating, "Inclusion of the surgical fees owed to King and Mockovak in the net asset valuation calculation was proper because this was a debt acknowledged by the interested parties."

Exhibit 35 listed the fees owed each surgeon for July 2008 to October 2009, the last full month Mockovak operated on patients. According to this spreadsheet, in October 2009, the corporations owed Mockovak $487,873 and King $907,489. McDaniel testified that the surgical fees "were acknowledged as debt by . . . King and everyone that [McDaniel] had talked to" including Monea. King testified, "The debt that was paid down to outside creditors was balanced essentially in the amount that was owed to the surgeons." Monea testified he believed the surgical fees were "considered to be . . . debt" because "the idea was [they were] going to be paid at some point

---

[16] Mockovak relies on an 1887 South Carolina case as authority for his assertion that the question of whether or not something is a debt presents a question of law. Lowry v. Jackson, 3 S.E. 473, 476-77 (1887). In that case, the Supreme Court of South Carolina focused, in part, on what the plaintiffs had to assert in the pleadings to survive the defendant's demurrer. Lowry, 3 S.E. at 476-77. The court did not conduct a broad analysis of whether a debt's existence was an issue of law or fact. Lowry, 3 S.E. at 476-77. Mockovak also cites a Washington State case addressing the question of whether an action cured a breach presented a question of fact or law. Moulden & Sons, Inc. v. Osaka Landscaping, 21 Wn. App. 194, 197, 584 P.2d 968 (1978). But, whether a cure is sufficient under a contract presents a much different question than whether or not parties considered something to be a debt. These cases do not persuade us of the correctness of Mockovak's assertions.

hopefully." Although the fees were not shown on the books, Monea testified that they were a long-term obligation of the corporation that he would disclose to an auditor. In an email exchange, Monea said he would "keep track of each of [their] surgical earnings based upon 10% revenue" and that he would "At the end of 2009, I will true up the amount." This would allow him to identify the "payable due" from each surgeon and the "amount due to each." He recommended paying third party loans and obligations first and then the surgical earnings. In a later email, Mockovak stated that his understanding was that "[a]fter we have eliminated these obligations [on the part of the corporations] we will begin to pay both [King] and [Mockovak] for the surgical fees on the spreadsheet for which they have not been paid."

The surgical fees totaled $1,395,362, which is "almost $1.4 million in unpaid surgical fees." Mockovak does not challenge the final seven words of that finding, that KMEC and the other corporations "owed third parties more than $1.47 million," and $1.4 plus $1.47 is "more than $2.8." So, substantial evidence supports the finding stating, "Coming out of the 2008-2009 global recession, KMEC and the other corporations were collectively more than $2.8 million in debt. They owed King and Mockovak almost $1.4 million in unpaid surgical fees and owed third parties more than $1.47 million." And, because Monea, King, and Mockovak all stated at some point that the corporations would pay the fees when able, substantial evidence supports the finding stating, "Inclusion of the surgical fees owed to King and Mockovak in the net asset valuation calculation was proper because this was a debt acknowledged by the interested parties." Substantial evidence supports these challenged findings.

Mockovak also challenges the finding stating, "The valuation performed by King's expert took into account the proper valuation factors and applied the appropriate valuation method." He also challenges the finding stating "The fair value of Mockovak's cancelled KMEC shares, as of January 27, 2011 was negative $233,584." Finally, he challenges the conclusion of law stating "Because Mockovak's cancelled KMEC shares had a negative fair value (i.e., negative $233,584) as of January 27, 2011, KMEC is not required to make any payment to Mockovak to purchase the cancelled shares. Nor is there any interest due on the unpaid purchase price."

Like the findings about debt, he asserts that these findings are actually conclusions of law. But, "[p]roperty valuation is a determination to be made by the trier of fact."[17] And, the trial court looks to "[t]he facts of the case [to] determine which factors are relevant and which valuation methods are appropriate."[18] So, we consider these statements about valuations to be findings of fact and review them for substantial evidence.

Unchallenged finding of fact 47 states that "Because KMEC was not a going concern as of January 27, 2011, the net asset approach [was] the appropriate method

---

[17] Eagleview Technologies, Inc. v. Pikover, 192 Wn. App. 299, 309, 365 P.3d 1264 (2015) (citing Worthington v. Worthington, 73 Wn.2d 759, 762, 440 P.2d 478 (1968)).

[18] Eagleview Technologies, Inc., 192 Wn. App. at 310 (citing Bell v. Kirby Lumber Corp., 413 A.2d 137 (Del. 1980)). Mockovak cites to a footnote in Robblee v. Robblee, 68 Wn. App. 69, 74, 841 P.2d 1289 (1992) (stating that two findings of fact, one finding that majority shareholder "did not engage in oppressive actions" towards the minority shareholder and the other finding that the price per share was $32.17, were "arguably conclusions of law.") The issues the Robblee court analyzed de novo were (1) what are considered, under the law, oppressive actions between a majority and minority shareholder, and (2) when is it appropriate for a court to apply a fair market value discount. Robblee, 68 Wn. App at 76-80. Neither of these provide a parallel to the questions before the court here.

to value the company." McDaniel used the "net asset" approach. He included the off-book unpaid surgery fees accruing in 2009 as debts in his valuation. As discussed above, substantial evidence supports the trial court's findings that the off-book surgical fees were debts. Based on this method, McDaniel determined, that as of January 27, 2011, the value of KMEC shares was negative $467,168. One-half of negative $467,168 is negative $233,584. So, substantial evidence supports the trial court's finding that McDaniel appropriately valued the company. And, substantial evidence supports the finding that Mockovak's shares were worth negative $233,584. The conclusion of law stating KMEC owed Mockovak nothing for his 50 percent cancelled shares and that no interest accrued on the negative value of the shares flows from these findings. So, the trial court did not err in this conclusion of law.

Mockovak also asserts that the inclusion of "off-book" liabilities was legally improper when using the net assets method to value the shares of a closely held corporation. But, he provides no persuasive authority for this contention. He relies on Bank of California v. First Mortgage Company[19] where the appellate court reviewed a trial court's valuation in the case of a deceased majority shareholder in the context of a stockholder buy-out agreement.[20] The appellate court affirmed the trial court's adjustment upward of the company value because the most recent year's balance sheets incorporated a downward adjustment in value that the company's previous balance sheets did not reflect.[21] The court decided that the valuation based upon this

---

[19] 6 Wn. App. 718, 721, 495 P.2d 1057 (1972).
[20] Bank of California, 6 Wn. App. at 719.
[21] Bank of California, 6 Wn. App. at 721.

adjustment was not uniform or predictable.[22]  Mockovak does not allege that the surgeon fees were unpredictable or non-uniform.  And, because this case does not address whether a statutory valuation may incorporate off-book debts, it does not help Mockovak.  His claim fails.

<u>Attorney Fees</u>

Mockovak requests attorney fees.  Because he does not prevail, we deny his request.

**CONCLUSION**

We affirm.  Mockovak failed to preserve his claims.  And, substantial evidence supports the challenged findings of fact.  Because the conclusion of law flows from these findings, the trial court did not err.

_____
Leach, J.

WE CONCUR:

_____
Mann, C.J.

_____
Appelwick, J.

---

[22] <u>Bank of California</u>, 6 Wn. App. at 721.